IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SAUDHY M. BLISS,                            )
                                            )
    *Plaintiff*,                             )
                                            )
    v.                                     )      Case No. 1:22-cv-563 (PTG/IDD)
                                            )
MERRICK B. GARLAND, Attorney General        )
    of the United States,                  )
                                            )
    *Defendant*.                            )

## MEMORANDUM OPINION

This matter came before the Court on Defendant's Motion for Summary Judgment ("Motion"). Dkt. 88. Defendant moved for summary judgment on Plaintiff's claim that she had been subjected to disparate treatment on the bases of color, sex, and national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17. *Id.* On March 14, 2024, this Court held a hearing on Defendant's Motion. *See* Dkt 101. At the conclusion of the hearing, the Court granted Defendant's Motion. Dkt. 102. This Memorandum Opinion supplements the Court's oral ruling.

### Factual and Procedural Background

Plaintiff Saudhy Bliss applied to be a Special Agent with the Drug Enforcement Agency ("DEA"). Dkt. 89, Defendant's Exhibit ("DEX") 2 at 23:6–22. On April 10, 2019, the DEA notified Plaintiff of her selection for Basic Agent Training Class # 219. DEX 3 at 104. The offer letter conditioned her employment upon "successful completion of the Basic Agent Training Program[,]" which consisted of eighteen (18) weeks of extensive training. DEX 3 at 106; DEX 1 at 4. On April 28, 2019, Plaintiff reported to the DEA Training Academy in Quantico, Virginia as

1

a Basic Agent Trainee ("BAT").  DEX 4 at 108.  Plaintiff's employment was subject to a two-year trial period, which also began on April 28th.  *Id.*

### A. BAT Requirements for Successful Completion and Rules for Dismissal

DEA Division Order 412 ("Order 412") dictates the requirements for BATs to successfully complete basic training and the procedures to assess them.  DEX 10.  Section 5.0 of Order 412 states that "a BAT must receive a passing score in Nine (9) performance-based disciplines, demonstrate that he/she possesses the necessary Eight (8) critical job-related traits and characteristics to be a Special Agent, and conducts himself/herself in a safe manner at all times throughout the Basic Agent Training Program."  DEX 10 at 2.  Those performance-based disciplines include: physical fitness; standards of conduct; academics/legal; report writing; practical applications/exercises; driver training; defensive tactics; tactical/raids training; and firearms/weapons training.  *Id.*

Pertinent here, successful completion of the firearms/weapons discipline requires BATs to receive a 70% score on two Firearms Qualification Events ("FQE"), out of a maximum three administrations.  DEX 10 at 15.  Failure of one FQE counts as a failure in a performance-based discipline.  *Id.*

In addition to setting out requirements, Order 412 dictates the dismissal of BATS:

> A BAT who accumulates TWO (2) failures in a single discipline has failed to meet the minimum standards of the Basic Agent Training Program.  The BAT will be dismissed from the Basic Agent Training Program and returned to his/her office of hire for a final employment decision unless it is determined by the Human Resources Division (HR) that the BAT should be terminated from [the DEA Training Academy].

> A BAT who accumulates THREE (3) or more failures in any combination of the performance-based disciplines will be dismissed from the Basic Agent Training Program and returned to his/her office of hire for a final employment decision unless it is determined by the Human Resources Division (HR) that the BAT should be terminated from [the DEA Training Academy].

2

DEX 10 at 2.   On April 29, 2019, Plaintiff received a copy of these requirements, and acknowledged that she read and understood them.  DEX 11.

Special Agent Nick Macri ("SA Macri") served as Plaintiff's primary tactical training instructor.  DEX 12 at 1.   On April 29, 2019, SA Macri issued a memorandum to BAT Class 219 regarding the tactical training program.  *Id.*  The memorandum identified four specific areas of instruction:  physical training; defensive tactics; vehicle involved arrests; and raids.  *Id.*  Plaintiff signed SA Macri's memorandum on April 29, 2019.  *Id.* at 2.

### B. Plaintiff's Performance During Tactical/Raids Training and Firearms Training

On June 26, 2019, SA David Stahl ("SA Stahl") and Unit Chief Jared Johnson conducted the firearms qualification examination.  DEX 13 at 43.  Plaintiff scored 66 out of a possible 100 points on her first attempt.  *Id.* at 44.  As stated, a minimal score of 70 points is required to pass. DEX 10 at 15.   On Plaintiff's second attempt, she scored 72 points.  DEX 13 at 44.  Because Plaintiff did not earn the minimum score of 70 on her first attempt, Plaintiff did not meet the requirements of Order 412, Section 5.9.2.  DEX 13 at 44–45.  SA Stahl issued Plaintiff a Basic Agent Trainee Notice of Action Form ("BATNAF").  *Id.* at 45.  This form advised Plaintiff that she failed her first firearms qualification session due to scoring 66 on one of the courses and reminded Plaintiff that she was required to pass at least two of the FQEs to successfully complete basic training.  *Id.* at 44–45.

Plaintiff also had difficulty with respect to her tactical training.  During Raids Exercises #1 to #4, Plaintiff and the other BATs received instruction in mission-critical skills in a controlled environment.  DEX 14 ¶ 3.  Raids Exercises #5 to #10, which increased in difficulty from the previous raids exercises, were live scenarios in which BATs were required to demonstrate the skills they had learned thus far in training.  DEX 14 ¶ 4.  During his deposition, SA Macri testified

Plaintiff "made mistakes [during Raids Exercise #5] that showed she failed to grasp basic principles that had been taught in Raids 1 through 4." DEX 14 ¶ 6. Because Raids Exercise #5 was the BATs' first active scenario, SA Macri chose not to issue Plaintiff a BATNAF, despite her performance. DEX 14 ¶ 6.[1]

On July 19, 2019, Plaintiff participated in Raids Exercise #6. DEX 15. Raids Exercise #6, required Plaintiff and a group of her fellow BATs to safely clear a house of suspects while demonstrating mission critical skills. DEX 2 at 66:2–67:7; DEX 14 ¶ 7. After the exercise, SA Macri issued a BATNAF to Plaintiff, identifying areas of deficient performance. DEX 15. In particular, the BATNAF indicated Plaintiff failed to demonstrate five mission critical skills: unable to properly cover threat areas, unable to clear threat areas, deficient in identifying threat areas, insufficient communication and improper positioning. DEX 15 at 52–53.

In the BATNAF, SA Macri noted that Plaintiff "was unable to properly demonstrate basic dynamic entry concepts[,]" including "exposing [a fellow BAT's] back to a threat area" and handling her firearms in a fashion that left her "without the ability to use lethal force if required." *Id.* at 53–54. SA Macri also documented that Plaintiff had displayed a "lack of physical and verbal response" to a fellow BAT's request for assistance. DEX 15 at 54. SA Macri noted that Plaintiff had received about twenty hours of tactical operations training prior to Raids Exercise #6, including the concepts she had failed to demonstrate. DEX 15 at 55. SA Macri concluded that

---

[1] Plaintiff attempts to dispute SA Macri's "claims of alleged failures" and argues that "other BATs committed errors but were not threatened with failure in an upcoming exercise." Dkt. 99 at 7. As support for the proposition, Plaintiff proffers the BATNAF issued to BAT Soebbing (another female BAT), which noted BAT Soebbing's deficient handcuffing and inadequate verbal commands. *See* PEX D at 2. Pointing to the shortcomings of another BAT does not effectively controvert SA Macri's testimony. Moreover, the BATNAF issued to BAT Soebbing contradicts Plaintiff's later argument that BAT Soebbing "was not issued a failure[.]" Dkt. 99 at 8. On the contrary, SA Macri testified that he determined not to issue Plaintiff a BATNAF for her deficiencies, while he issued a BATNAF to BAT Soebbing.

Plaintiff had "demonstrated the inability to learn and demonstrate basic techniques essential for law enforcement activities" and "failed to demonstrate proper position (and knowledge of her position)" three times during Raids Exercise #6.  DEX 15 at 55.

Plaintiff acknowledged receipt of the BATNAF for Raids Exercise #6.  DEX 15 at 55. Thereafter, SA Macri and Unit Chief James De Leo ("UC De Leo") offered Plaintiff and another BAT remedial raids training.  DEX 2 at 178:10–20.[2]

On July 26, 2019, Plaintiff participated in Raids Exercise #8.  DEX 20.  This exercise required Plaintiff, working alone and in a group scenario, to extract an undercover agent from a barricaded house.  DEX 2 at 108:16–25, 109:19–23; DEX 20 at 44–46.  After the exercise, SA

---

[2] Plaintiff disputes these facts, stating that she "has provided a different version of what occurred that is more reasonable and factual[.]"  Dkt. 99 at 8.  Plaintiff offers only her affidavit taken telephonically by the Equal Employment Opportunity ("EEO") Investigator regarding Plaintiff's EEO Complaint.  *Id.*  Plaintiff does not cite to the appropriate page within the thirty-nine pages that is relevant to this argument.  Plaintiff's affidavit does not raise a genuine issue of material fact with respect to the facts as described in the SUMF ¶¶ 26 to 33.

In addition, Plaintiff provides that BATNAFs were issued to BATs Soebbing (a white female), Childs (a black female), and Jeppson (a white male) for their deficiencies during Raids Exercise #6.  Dkt. 99 at 8; *see* PEX C at 8–16.  Plaintiff argues that these BATNAFs support her argument that these BATs received more favorable treatment than she because BATs Soebbing, Childs, and Jeppson "made the same or similar mistake[s]" during Raids Exercise #6 "but were not failed[.]"  Dkt. 99 at 8.  Plaintiff's arguments are not supported by the record.

Unlike Plaintiff, who received an "Unsatisfactory Performance[,]" BAT Childs received a "Needs Improvement Performance" while BATs Soebbing and Jeppson received a "Counseling of Action/Incident" on their BATNAFs.  DEX 15 at 52; PEX C at 8–16.  Both Plaintiff and BAT Jeppson's BATNAFs noted five requirements from Order 412 in which they were deficient. DEX 15 at 52; PEX C at 14.  However, BAT Soebbing's BATNAF noted four requirements and BAT Childs' BATNAF noted two requirements.  *Id.* at 8, 11.  Furthermore, Plaintiff's BATNAF listed five mission critical skills in which she had been deficient.  DEX 15 at 52–53.  BAT Childs' BATNAF listed four mission critical skills, BAT Jeppson's BATNAF listed three mission critical skills, and BAT Soebbing's BATNAF listed two mission critical skills.  PEX C at 8, 11, 14.  Thus, Plaintiff's BATNAF stands out from the other three proffered BATNAFs as the BATNAF with the highest number of requirements from Order 412 and mission critical skills in which she was deficient.  These three BATNAFs do not raise a genuine issue of material fact that Plaintiff "performed equal to if not better" than these three BATs nor that she made "the same or similar mistake[s.]"  Dkt. 99 at 8.

Macri issued Plaintiff another BATNAF. DEX 20. The BATNAF identified deficiencies in five mission critical skills:  improper positioning, inadequate verbal commands, insufficient communication, unable to properly cover threat areas, pre/post briefing. DEX 20 at 43–44.

In the BATNAF, SA Macri noted that Plaintiff "abandoned her position covering the primary suspect," which resulted in Plaintiff exposing the front of her body to the secondary suspect and her back to the primary suspect. DEX 20 at 45. As a result, the secondary suspect fired "simunition rounds" at Plaintiff, striking Plaintiff in the forehead. *Id.* SA Macri wrote that Plaintiff also "ignored the transmissions [of fellow BATs during the exercise] and did not respond." *Id.* SA Macri further noted that Plaintiff "abandon[ed] the use of her primary weapon" while attempting to recover the suspect's weapons. *Id.* The BATNAF also documented that, during another scenario during Raids Exercise #8, Plaintiff performed poorly in pre- and post-exercise briefings by misidentifying the names and roles of the suspects and undercover agent and the sequence of events. *Id.* at 46.[3]

---

[3] Plaintiff disputes the facts as described in SUMF ¶¶ 34 to 40. Dkt. 99 at 10. Plaintiff states that she was unable to complete Raids Exercise #8 due to her head injury, citing her affidavit and deposition as support. *Id.* (citing PEX A at 13–17; DEX 2 at 126:20–133:25). Plaintiff also proffers the deposition of Dr. Marc Sharfman, her treating physician, as support. *Id.* (citing PEX I at 40:24–41:11). Dr. Sharfman testified that a person suffering from a "frontal lobe injury," the same as Plaintiff received during Raids Exercise #8, would experience difficulty with concentration, organization, language, mood changes, judgment, and memory. PEX I at 40:24–41:11. Plaintiff does not raise a genuine dispute of material fact as to the events as recorded and discussed in SUMF ¶¶ 34 to 40.

Plaintiff again argues that fellow BATs "perform[ed] their duties at an unacceptable level during Raids [Exercise] #8 without consequence." Dkt. 99 at 11. Plaintiff proffers the BATNAF issued to BAT Childs as support for this argument. *See* PEX K. However, BAT Childs' BATNAF indicated that she received an "unsatisfactory performance" for Raids Exercise #8, as did Plaintiff. *Id.*; DEX 20 at 43. In addition, Plaintiff provides other BATNAFs issued to BAT Childs, appearing to argue that she was treated differently than BAT Childs. *See* PEX L. BAT Childs' BATNAFs differ in the cited number of requirements of Order 412 and mission critical skills than Plaintiff's BATNAFs, and contain various types of actions, including "Counseling of Action/Incident[,]" "Unsatisfactory Performance[,]" and "Needs Improvement Performance[.]" *Id.* at 2, 5, 9. In addition, BAT Childs' BATNAFs were not limited to the same Raids Exercises as Plaintiff's, but

After Raids Exercise #8, a DEA athletic trainer asked Plaintiff if she was alright as she had sustained an injury during the exercise. DEX 2 at 134:6–15. Plaintiff informed the trainer that her head hurt, and she was given gauze for the wound. *Id.* Shortly thereafter, staff at the onsite DEA medical facility gave Plaintiff additional bandages for her head. *Id.* at 141:8–18. Plaintiff did not tell other DEA personnel about her medical symptoms or request additional medical care after the raids exercise. DEX 2 at 138:23–144:1.[4]

### C.  Plaintiff's Dismissal from the DEA Training Academy

By letter dated July 29, 2019, Special Agent in Charge ("SAC") Wendy Woolcock advised Plaintiff that she would be dismissed from the DEA Training Academy because Plaintiff "accumulate[d] two failures in a single discipline, or three or more failures in any combination of the performance-based disciplines[.]" DEX 23.[5] SAC Woolcock identified the following events as supporting her dismissal decision:  (1) Plaintiff's June 26, 2019 failure to meet the standards for the handgun qualification course; (2) Plaintiff's July 19, 2019 failure to meet the standards for Raids Exercise #6; and (3) Plaintiff's July 26, 2019 failure to meet the standards for Raids Exercise #8.  *Id.*[6] Plaintiff signed the dismissal letter as "[r]eceived" and was further ordered to report to the Orlando District Office on the following day, July 30, 2019.  DEX 23; DEX 5.[7]

---

included a "PT/DT" event, an FQE, and Raids Exercise #10, which Plaintiff was unable to participate in. *Id.*

[4] Plaintiff neither admitted nor disputed the facts.  Thus, they are admitted.

[5] Plaintiff appears to dispute these facts, arguing that the submissions on which SAC Woolcock's decision was based "were biased and not a true representation of Plaintiff's performance."  Dkt. 99 at 13.  Plaintiff does not provide support for this argument.  Thus, she has not effectively disputed the facts.

[6] Plaintiff appears to dispute the facts, arguing that "Defendant omits that [P]laintiff explained everything that she had to endure to SAC Woolcock[.]" Dkt. 99 at 13.  Plaintiff does not provide support for this argument.  Thus, she has not effectively disputed Defendant's asserted facts.

[7] Plaintiff neither admitted nor disputed these facts.  Thus, they are admitted.

On July 30, 2019, Plaintiff reported to the Orlando District Office. DEX 2 at 143:11–25. While Plaintiff worked out of the Orlando District Office, DEA personnel assessed whether she could be placed in a different position within the DEA. DEX 25, 26. Because Plaintiff was "not eligible for non-competitive appointment," and because Plaintiff expressed an intent to return to her prior employment, the DEA continued with processing her termination from the DEA. DEX 26.[8]

On December 4, 2019, SAC Michael Barbuti signed Plaintiff's removal letter. DEX 5 at 2.[9] In the letter, SAC Barbuti noted that Plaintiff "accumulated a total of two (2) failures in a single performance-based discipline, and three (3) failures overall in performance based disciplines." *Id*.[10] On December 6, 2019, Plaintiff's removal from DEA employment became effective. DEX 27.

On November 25, 2022, Plaintiff filed the Third Amended Complaint against Defendant, alleging that Defendant had discriminated against her on the basis of her sex, color, and national origin and created a hostile work environment, violating Title VII. Dkt. 53. On July 19, 2023, the Court granted Defendant's Motion to Dismiss as to the hostile work environment claim but

---

[8] Plaintiff appears to dispute the facts as described. Dkt. 99 at 14. First, Plaintiff asserts that upon reporting to Orlando, she was sent to the emergency room and was diagnosed with a concussion. *Id.* Plaintiff does not provide any support for this proposition. The Court notes that Plaintiff stated in her deposition that she was sent to the emergency room by DEA personnel on June 30, 2019. DEX 2 at 143:11–25. Plaintiff also characterizes the statement that Defendant attempted to find another suitable position for her as "misleading" because "it was determined that Plaintiff was going to be terminated but [for] the fact that she filed a EEO complaint[.]" Dkt. 99 at 14. Plaintiff does not provide any support for this argument and thus, does not raise a genuine dispute of material fact as to the facts as described.

[9] Plaintiff neither admitted nor disputed this fact. Thus, it is admitted.

[10] Plaintiff argues that this is a "false statement[.]" Dkt. 99 at 14. Plaintiff cites to her affidavit, arguing that "[s]he was always under stress" because of constant harassment from SAs Macri, Menino, and Johnson. *Id.* (citing PEX A at 26–27). However, Plaintiff does not raise a genuine dispute of material fact that she "accumulated a total of two (2) failures in a single performance based discipline, and three (3) failures overall in performance based disciplines."

allowed the disparate treatment claim to proceed.  Dkt. 69.  On February 6, 2024, after completing

discovery, Defendant filed the instant Motion.  Dkt. 88.

### Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine

dispute about a material fact exists if "after reviewing the record as a whole, a court finds that a

reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of

Am.*, 673 F.3d 323, 330 (4th Cir. 2012).  All inferences must be made in favor of the nonmoving

party. *Hawkins v. McMillan*, 670 F. App'x 167, 168 (4th Cir. 2016).  A party survives summary

judgment by "citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials[.]"  Fed. R.

Civ. P. 56(c)(1)(A).

Where the non-moving party bears the burden of proof, the party moving for summary

judgment may prevail by showing an absence of evidence to support an essential element of that

party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986); *see also Rhodes v. E.I. du

Pont de Nemours & Co.*, 636 F.3d 88, 94 (4th Cir. 2011).  Once the moving party has successfully

demonstrated that absence, the non-moving party must "come forward with specific facts," rather

than just "metaphysical doubt[s]" or conclusory allegations, that prove that there is a genuine

dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)

(quotation marks and citations omitted); *see also Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d

1027, 1037 (4th Cir. 2020) (stating that conclusory assertions and denials are not sufficient to

preclude granting a summary judgment motion).  The court must "draw any permissible inference

from the underlying facts in the light most favorable to the party opposing the motion." *Thompson*

*Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citation omitted).

That being said, "those inferences must, in every case, fall within the range of reasonable

probability and not be so tenuous as to amount to speculation or conjecture." *Id.*

### Discussion

A plaintiff may prove discrimination through direct or indirect evidence of discriminatory

animus, or through the burden-shifting framework set forth by the U.S. Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Foster v. Univ. of Md.-E. Shore*, 787

F.3d 243, 249 (4th Cir. 2015).

Where the record contains no direct evidence of discrimination,[11] a plaintiff must first

establish a *prima facie* case by showing "(1) membership in a protected class; (2) satisfactory job

performance; (3) adverse employment action; and (4) different treatment from similarly situated

employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th

Cir. 2010), *aff'd sub nom. Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30 (2012). If the plaintiff

establishes a *prima facie* case by a preponderance of the evidence, the burden shifts to the

defendant to show that its purportedly discriminatory adverse action was in fact the result of a

legitimate, nondiscriminatory reason. *Foster*, 787 F.3d at 250. If the defendant does so, the burden

shifts back to the plaintiff to rebut the defendant's evidence by demonstrating that its articulated

legitimate, nondiscriminatory reason was "not its true reason[], but [was] a pretext for

---

[11] Plaintiff's Opposition stated that "the disputed material facts . . . suggest that there is direct evidence of discrimination in the form of affidavits, deposition testimony and documents[.]" Dkt. 99 at 16. Yet, Plaintiff failed to provide further argument nor any citations to the record to support this assertion. *Id.* Without this evidence, the Court proceeded, as it must, under the burden shifting framework.

discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Here, Defendant raised three main arguments in support of its Motion for Summary Judgment.[12] First, Defendant argued that Plaintiff could not meet her *prima facie* burden because she could not show that her protected classifications played a role in the decision-making process since not every evaluator and decisionmaker knew of the combination of Plaintiff's three asserted protected classifications. *See* Dkt. 89 at 14–16. Second, Defendant argued that Plaintiff was unable to demonstrate that she was performing her job in a satisfactory manner. *Id.* at 16–18. Finally, Defendant argued that even if Plaintiff were able to establish a *prima facie* claim, Defendant nevertheless met its burden to articulate a legitimate, non-discriminatory, and non-pretextual, reason for dismissing Plaintiff from the DEA Training Academy: "Plaintiff's three performance-based failures" during training. *Id.* at 18–20.

## I.     A Genuine Dispute of Material Fact Existed as to Whether the Relevant Decisionmaker Knew of Plaintiff's Protected Status

Defendant argued that he was entitled to summary judgment because Plaintiff could not establish that "every decisionmaker (including those who evaluated her) knew of the combination of her three protected classifications asserted in this case: sex (female); color (Brown); and national origin (Puerto Rico, Hispanic)." *Id.* at 15. According to Defendant, Plaintiff needed to demonstrate that at least five individuals—SA Johnson, SA Menino, SA Macri, UC De Leo, and SAC Woolcock—knew of Plaintiff's status as a protected individual and were the decisionmakers

---

[12] In his Reply, Defendant argued that Plaintiff's *prima facie* case also fails because she failed to establish the existence of similarly situated comparators. Dkt. 100 at 16-19. Because summary judgment can be granted based on Plaintiff's failure to show that she performed satisfactorily, the Court does not need to address this argument.

in the decision to terminate Plaintiff from the DEA Training Academy.  *Id.*  The Court found Defendant's argument to be unpersuasive.

"An individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that 'the protected trait . . . actually motivated the employer's decision.'"  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (en banc), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)).  For this to occur, "there . . . must be some indication that the *deciding officials* were aware of the applicant's status as a protected individual."  *Gladden v. Locke*, 2011 WL 2619570, at *5 (D. Md. June 30, 2011) (emphasis added), *aff'd sub nom. Gladden v. U.S. Dep't of Comm.*, 474 F. App'x 947 (4th Cir. 2012).

Here, the Court found that the "deciding official" in the decision to terminate Plaintiff was SA Marci.  *Gladden*, 2011 WL 2619570, at *5.  The record demonstrated that Plaintiff's primary tactical training instructor was SA Macri.  DEX 12 at 1.  SA Macri was the one who issued the April 29, 2019 memorandum to Plaintiff's BAT Class regarding the tactical training program at the DEA Training Academy.  DEX 12.  Furthermore, it was also SA Macri who issued BATNAFs to Plaintiff for her performance during Raids Exercises #6 and #8, which qualified Plaintiff for dismissal from the DEA Training Academy.  DEX 15, 20.  This is further supported by Plaintiff's deposition testimony in which she testified that it was SA Macri who "pulled [her] aside and told [her] that [she] failed Raids 8[.]"  DEX 2 at 144:14–23.  SA Macri then told Plaintiff, "[Y]ou're

no longer in the academy . . . you're dismissed." *Id.*[13]  Accordingly, this Court found SA Macri was the "deciding official" in Plaintiff's termination.

This Court also disagreed with Defendant's argument that in order to establish a *prima facie* case of discrimination, Plaintiff needed to demonstrate that the deciding official had actual knowledge of the "combination of her protected classifications[.]" Dkt. 89 at 15.  In addressing Defendant's previous Motion to Dismiss, the Court noted that "Plaintiff appears to allege an intersectional claim on . . . three protected bases." Dkt. 69 at 9.  "Intersectionality theory posits that individuals have multiple identities that are not addressed by legal doctrines based solely on a single identity of status." *Westmoreland v. Prince George's Cnty.*, 876 F. Supp. 2d 594, 604 (D. Md. 2012) (quoting Dianne Avery, *et al.*, *Employment Discrimination Law* 47 (8th ed. 2010)).  In other words, "some cases present evidence that points to discrimination occurring not only because of the plaintiff's sex, but because of both sex and some other characteristic." *Id.* (quoting Avery, *et al.*, *supra*, at 352).  Although the Fourth Circuit has yet to address the issue, other courts have determined that a plaintiff may assert intersectional claims of discrimination under Title VII. *Id.* (noting that following the leading case on the subject, *Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025 (5th Cir. 1980), other federal courts, including at least two circuits, have embraced intersectional claims as cognizable under Title VII).  This Court found the same to be true in this instant action.

Here, in her Third Amended Complaint, "Plaintiff consistently contends that she was discriminated against as a Hispanic female." Dkt. 69 at 11 (citing Dkt. 53 ¶ 115 ("female, brown

---

[13] The Court further notes that although SAC Woodlock signed Plaintiff's termination letter, SAC Woolcock referred to herself as a "third or fourth level supervisor" to Plaintiff and had "limited interaction" with her.  DEX 23; DEX 24 at 3.

skin and of Hispanic national origin"));[14] *see also* Dkt. 53 ¶¶ 33, 70, 90, 115–16. Plaintiff also

testified to that effect during her deposition, stating that she was discriminated against because she

"was Hispanic and a brown female." DEX 2 at 180:11–13. Defendant failed to present sound

argument as to why Plaintiff's disparate treatment claim could not proceed as intersectional claims

of sex, color, and national origin discrimination.[15] Thus, the Court was persuaded that under the

---

[14] Although Plaintiff's Third Amended Complaint recognizes "Hispanic" as a type of "national origin," in discrimination case law, Hispanic is often—and in some courts, must be—treated as a race, not a national origin. *See, e.g.*, *Vill. of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016) ("[D]iscrimination based on ethnicity, including Hispanicity or lack thereof, constitutes racial discrimination under Title VII."); *Diaz v. Kraft Foods Glob., Inc.*, 653 F.3d 582, 586 (7th Cir. 2011) (noting that the Hispanic plaintiffs filed a charge of discrimination "because of their race"); *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 970 (10th Cir. 1979) (recognizing that while a Mexican-American identity is not necessarily a race, community attitudes differentiating Hispanic people from "Anglos" are sufficiently akin to racial prejudice to assert a 42 U.S.C. § 1981 claim of discrimination against Mexican-Americans). Complaints alleging racial discrimination because the plaintiff is Hispanic frequently also contain allegations that the plaintiff has brown skin. *See, e.g.*, *Gomez v. Alexian Bros. Hosp. of San Jose*, 698 F.2d 1019, 1020 (9th Cir. 1983) (per curiam) (considering claim of race discrimination alleged by plaintiff who was Hispanic with "brown faces"); *Blackmon v. Spahn*, 2023 WL 5804275, at *1 (D. Md. Sept. 7, 2023) (considering a claim of racial discrimination alleged by a "Brown African-American" and "Hispanic" woman).

[15] Defendant largely relies on evidence that Plaintiff's five evaluators and decisionmakers, as Defendant identifies them, were unaware of Plaintiff's national origin being Puerto Rican. *See* Dkt. 89 at 15 & n.2. Although Plaintiff's Third Amended Complaint states that she is Puerto Rican, she overwhelmingly describes herself as Hispanic. *See* Dkt. 53 ¶¶ 1, 22–23, 70, 90, 110, 115–16, 130, 136–37 (defining herself as "Hispanic" about fourteen times and defining herself as being from Puerto Rico four times). Thus, the Court was not convinced by Defendant's argument that all five of Plaintiff's evaluators and decisionmakers were unaware that she was either Hispanic or originally from Puerto Rico.

Moreover, the Court was unpersuaded by the case law Defendant cited in support of his argument that Plaintiff's evaluators and decisionmakers had to be aware of all the combination of all three of her protected characteristics such that lack of knowledge of one characteristic warranted dismissal of the entire claim. *See* Dkt. 89 at 15–16. For instance, Defendant cited *Kenny v. AT&T*, a case in which the plaintiff pled that the defendant had discriminated against him on the bases of age, national origin, and religion. No. 1:17-cv-300, 2017 WL 2843299, at *1 (E.D. Va. June 30, 2017); *see* Dkt. 89 at 15. Although the court determined that the plaintiff had not sufficiently alleged that the defendant was aware of his religion, the court nevertheless continued to consider the plaintiff's age and national origin claims. *Kenny*, 2017 WL 2843299, at *4. The same can be said of *Sahagian v. Paulson*, in which the court determined that the plaintiff's supervisor was

theory of intersectionality, Plaintiff's disparate treatment claim could proceed if Plaintiff established that SA Macri was aware that she was a brown, Hispanic female when he made the decision to refer her to SAC Woolcock for dismissal.

In looking at the record in totality, the Court found that a genuine dispute of material fact existed concerning whether "the deciding official[ ] [was] aware of the [Plaintiff]'s status as a protected individual"—as a brown, Hispanic woman. *Gladden*, 2011 WL 2619570, at *5. Concerning her protected status as a woman, SA Macri stated that he became aware of Plaintiff's sex before her time at the DEA Training Academy began. DEX 16 at 2 ("Prior to, on her profile that's sent, that was sent before she started, it states that she's female.").

Concerning being brown and Hispanic, when Plaintiff was interviewed by the EEOC in 2020, she stated that DEA deciding officials were aware of her protected classes by personal observation, noting her physical appearance, her skin color, and her Spanish accent. PEX A at 4. SA Macri testified that he was unaware of Plaintiff's color, despite training and supervising her in person at the DEA Training Academy for three full months. *See* DEX 16 at 2 (stating that he was not aware of Plaintiff's color until he "was notified by the EEO formal complaint"). The Court notes that other evaluators at the DEA Training Academy identified Plaintiff as Hispanic, despite presumably spending less time with Plaintiff and having less of a supervisory role over her during her time at the Training Academy. *See e.g.*, DEX 18 at 5. Furthermore, other evidence in the record—including one EEOC investigator's difficulty understanding Plaintiff when she spoke presumably because of her Spanish accent, and Plaintiff's picture included with photos of her other BAT Class members—supported Plaintiff's assertion that her status as a brown and Hispanic

---

unaware of the plaintiff's religion and national origin but continued to consider the plaintiff's other protected classes of race, gender, and age. *See* 2009 WL 10727665, at *5 (D. Md. May 20, 2009).

woman was apparent through personal observation. *See* PEX A at 10; Dkt. 95.  In sum, having

considered the record, this Court was persuaded that a genuine dispute of material fact existed as

to whether the relevant deciding official, SA Macri, was aware of Plaintiff's protected status as a

brown, Hispanic woman.

**II.    There Was No Genuine Dispute of Material Fact that Plaintiff was Unable to Establish that She Performed Her Job in a Satisfactory Manner**

Defendant next argued that even if the pertinent deciding official was on notice of her

protected classes, Defendant was still entitled to summary judgment because Plaintiff could not

establish that she performed her job at the DEA training academy in a satisfactory manner.  Dkt.

89 at 16–18.  The Court agreed.

To establish a *prima facie* case, Plaintiff must have demonstrated from the "perception of

the decision maker"—and not her own "self-assessment"—that her performance met the DEA's

legitimate expectations.  *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023)

(quoting *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996)).  In addition,

"[p]roof that [Plaintiff's] performance was comparable to h[er] co-workers' [was] *not* proof that

[Plaintiff's] performance met [the employer's] legitimate job performance expectations." *King v.*

*Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

The record demonstrated that successful completion of the DEA's Basic Agent Training

program required no more than three failures across all disciplines and no more than two failures

in a single discipline.  DEX 10 at 2–3.  The record showed, and Plaintiff admitted, that she failed

to perform satisfactorily in her FQE.  DEX 2 at 58:22–59:8, 61:2–6; DEX 13.  The record also

demonstrated that Plaintiff did not perform in raids exercises to the satisfaction of the DEA.

Regarding Raids Exercise #5, SA Macri, Plaintiff's primary instructor, stated that Plaintiff "failed

to grasp basic principles that she had been taught[.]" DEX 14 ¶ 6. Moreover, Plaintiff failed both Raid Exercises #6 and #8. DEX 15 at 53–55; DEX 20 at 2–4.

Plaintiff countered that the DEA interfered with her ability to perform satisfactorily "by requiring her to act in ways that others did not have to act, and holding her to a higher standard than all similarly-situated BATs[.]" Dkt. 99 at 21. In making this claim, Plaintiff contested only the BATNAFs she received for Raid Exercises #6 and #8.[16] *Id.* at 22.

Plaintiff was correct in her assertion that "evidence that the employer's expectations were not legitimate" can demonstrate that the employer's expectations were met. *Cannada v. Old Dominion Brush, Co.*, No. 3:20-cv-952, 2021 WL 5441506, at *5 (E.D. Va. Nov. 19, 2021). However, there was no such evidence in the record where Plaintiff's DEA instructors "concede[d] that [she] met their expectations" in some way, or "that Plaintiff was making improvements[,]" or that any "positive opinions of [her] performance" were made during her time at the DEA Training Academy. *Id.*; *see also O'Reilly v. Del Toro*, 2022 WL 3681957, at *7 (D. Md. Aug. 25, 2022) ("[S]he points to no evidence to show that her performance improved . . . or that concerns with her work performance . . . had been successfully addressed."). Further, Plaintiff did not proffer any expert witnesses, other than herself, who could testify as to the DEA's "legitimate job performance expectations and as to their own analysis and evaluation of [Plaintiff's] performance in light of those expectations." *King*, 145 F.3d at 150.

---

[16] Plaintiff did not contest the BATNAF she received for the FQE. Dkt. 99 at 22. In addition, Plaintiff discussed training exercises outside of the Raids Exercises in which she argued that she was treated differently. *Id.* For example, she referenced being assigned a "heavy male BAT" for a training exercise and being the only female BAT assigned to a male BAT for a boxing exercise. *Id.* at 22–23. Because these incidents did not contribute to her termination (as she did not receive BATNAFs for any associated failures), the Court did not consider them.

Without any of this in the record, the Court was left with only Plaintiff's own belief that she was held to a higher standard than other BATs. Fourth Circuit case law, however, strongly counsels against a finding that a plaintiff can create a genuine dispute of material fact as to their job performance simply on their opinion alone. *See, e.g.*, *Cannon v. Burlington Coat Factory of N.C., LLC*, 2014 WL 4924280, at *7 (M.D.N.C. Sept. 30, 2014), *aff'd*, 608 F. App'x 167 (4th Cir. 2015) ("Plaintiff has presented no evidence that the 'burdens' placed on him were 'a sham designed to hide the employer's discriminatory purpose.'"); *id.* ("[A]lthough Plaintiff may argue the reasonableness of what Defendant asked of him, none of Plaintiff's contentions call into question the legitimacy of Defendant's expectations."); *Apedjinou v. Inova Health Care Servs.*, No. 1:18-cv-287, 2018 WL 11269174, at *9 (E.D. Va. Dec. 19, 2018) ("[P]laintiff's own opinion that her misconduct was reasonable in light of the circumstances is not probative."). Thus, the Court declined to do so here.

Ultimately, the Court cannot and does not sit "as a kind of super-personnel department" over the DEA's assessment of Plaintiff's and her fellow BATs' performances at the DEA Training Academy. *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)). The Court's "sole concern is whether the reason for which the defendant discharged [Plaintiff] was discriminatory." *Id.* (quotation marks and citation omitted). On this record, there was no genuine dispute of material fact that Plaintiff did not satisfy Defendant's legitimate expectations for the job. Plaintiff had not shown that Defendant's expectations were not legitimate or that she was held to a higher standard than her fellow BATs. Thus, on this basis, summary judgment was granted.

### III. Defendant Proffered a Legitimate, Non-Discriminatory Reason for Plaintiff's Dismissal

Finally, even if Plaintiff could establish a *prima facie* case of discrimination, Defendant would nevertheless be entitled to summary judgment as Defendant articulated a legitimate, non-discriminatory reason for her dismissal from the DEA Training Academy, and Plaintiff had not demonstrated pretext on this record.

After a plaintiff establishes a *prima facie* case of discrimination, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision." *Lyons v. City of Alexandria*, 35 F.4th 285, 289 (4th Cir. 2022). This burden "is one of production, not persuasion[.]" *Moore v. Mukasey*, 305 F. App'x 111, 115 (4th Cir. 2008). To satisfy its burden, the defendant's reason must be "clear and reasonably specific" as well as "legally sufficient to justify a judgment for the defendant." *Burdine*, 450 U.S. at 255, 258.

Here, Order 412 provided that a BAT will be dismissed from the DEA Training Academy once she failed two exercises in a single discipline, or three exercises overall. *See* DEX 10 at 2. Defendant documented Plaintiff's failures in detail via its three BATNAFs and relied on these documents in SAC Woolcock's letter dismissing Plaintiff from the DEA Training Academy. DEX 13 at 43; DEX 15; DEX 20; DEX 23.

With respect to Raids Exercises #6 and #8, which Plaintiff contested, Defendant offered "clear and reasonably specific" explanations of the DEA's determination that Plaintiff's performance during these exercises was unsatisfactory. In both BATNAFs, SA Macri identified the skills that Plaintiff failed to demonstrate. DEX 15 at 52-53; DEX 20 at 43–44. After Raids Exercise #6, Plaintiff accepted SA Macri's offer of remedial tactical training. DEX 2 at 178:10–20; DEX 14 ¶ 9; DEX 19. Despite this training, at least three of the mission critical skills—improper positioning, insufficient communication, and unable to properly cover threat areas—

were identified as deficiencies in both exercises. DEX 15 at 52–53; DEX 20 at 43–44. In Raids Exercise #6, Plaintiff also failed to perform at clearing threat areas and at identifying threat areas. DEX 15 at 52. In Raids Exercise #8, Plaintiff gave inadequate verbal commands and failed at pre/post briefing. DEX 20 at 43–44. In short, Plaintiff's failure in both Raids Exercises #6 and #8 justified her dismissal from the DEA Training Academy pursuant to Order 412. Defendant, in relying upon Plaintiff's documented failure in the dismissal letter, met his burden of demonstrating a legitimate, non-discriminatory reason for Plaintiff's dismissal.

Once the defendant proffers a legitimate, non-discriminatory reason for the plaintiff's termination, the burden shifts to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was not its true reason but was pretext for discrimination. *Burdine*, 450 U.S. at 253. Here, Plaintiff raised two arguments concerning pretext: (1) the documented poor performance of similarly-situated BATs during Raids Exercises #6 and #8 is proof that the DEA's actions were a pretext for discriminatory animus and conduct; and (2) any BATNAF Plaintiff received related to Raids Exercise #8 could not be relied upon in her termination from the DEA because of the injury Plaintiff sustained during the exercise. Dkt. 99 at 24–27. The Court found neither of these two arguments to be persuasive.

As to the first argument, even if the Court considered Plaintiff's proffered BATNAFs as evidence of similarly-situated comparators,[17] by proffering such evidence, Plaintiff was again

---

[17] The Court agrees with Defendant that Plaintiff could not rely on BAT Childs as a similarly-situated comparator because Plaintiff did not identify BAT Childs during discovery. Dkt. 100 at 16 (citing DEX 28 at 20–25); Fed. R. Civ. P. 26(e)(1) (requiring a party supplement a response to discovery in a timely manner); Fed. R. Civ. P. 37(c)(1) (prohibiting a party from using information to supply evidence on a motion if that party failed to disclose or supplement necessary information during discovery); *Nat'l Org. for Marriage, Inc. v. United States*, 24 F. Supp. 3d 518, 525 n.3 (E.D. Va. 2014) (noting that pursuant to Fed. R. Civ. P. 37, it is appropriate to exclude a theory of liability for failure to identify such theory during discovery).

asking the Court to determine whether the DEA's assessment of her performance and the other BATs' performances "was wise, fair or even correct." *Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette*, 133 F.3d at 299). However, this was not the Court's mandate. Instead, the Court was tasked with determining whether the DEA's actual reason behind Plaintiff's dismissal was discriminatory animus. *See DeJarnette*, 133 F.3d at 299. Plaintiff's own assessment of her fellow BATs' performances during raids exercises is not probative evidence of pretext. *See Hawkins*, 203 F.3d at 280 ("[The plaintiff's] extensive efforts to rebut [the deciding official's] assessment of her performance simply do not provide a legally sufficient basis for [pretext].").

Neither the Court nor Plaintiff can replace the DEA's assessment of BATs' performances with that of its own, and for good reason. As SA Macri stated, the BATNAFs' ratings were based on multiple factors, including: (1) SA Macri's "and other instructors' observations of the BAT's performance[;]" (2) "the number of hours of training each BAT received in a particular discipline[;]" (3) the "particular mission-critical skill" emphasized during that exercise; (4) "whether the BAT had made the same mistakes in multiple exercises[;]" (5) "whether the BAT had been responsive to feedback after prior errors[;]" and (6) "whether the BAT's mistakes reflected reckless conduct." DEX 38 ¶¶ 3, 6–7. Thus, the Court could not subjectively look at the proffered BATNAFs and simply agree with Plaintiff that similarly-situated BATs "made more significant mistakes" than she did. Dkt. 99 at 7.

However, even if the Court analyzed the proffered BATNAFs, Plaintiff's alleged evidence of pretext tended to show the opposite to be true. The majority of BATNAFs Plaintiff proffered showed that the number of skills other BATs were unsuccessful in demonstrating during Raids Exercises #6 and #8 were *fewer* than the number of skills Plaintiff unsuccessfully demonstrated;

and as with Plaintiff, the DEA instructors issued remedial actions for the BATs or failed the BAT for their performance.

For instance, with respect to Raids Exercise #6, Plaintiff provided the BATNAFs of BAT Soebbing, a white female BAT, and of BAT Jeppson, a white male BAT. PEX C at 11, 14. BAT Soebbing was marked as unsuccessfully demonstrating four requirements of Order 412 and as deficient in two mission critical skills. *Id.* at 11–12. BAT Jeppson was marked as unsuccessfully demonstrating five requirements of Order 412 and as deficient in three mission critical skills. *Id.* at 14–15. Plaintiff, however, was marked as unsuccessfully demonstrating five requirements of Order 412 and as deficient in five mission critical skills. DEX 15. Of these BATs' BATNAFs, then, Plaintiff performed the poorest.

Plaintiff also proffered the BATNAF of BAT Barnes, a white female BAT. *See* PEX C at 2–4. Like Plaintiff, BAT Barnes received a BATNAF for unsatisfactory performance in Raids Exercise #8. *Id.* at 2. This occurred even though BAT Barnes' BATNAF identified fewer mission-critical skills in which she was deficient in comparison to Plaintiff. PEX C at 2 (citing three deficient skills for BAT Barnes); DEX 15 at 52-53 (citing five deficient skills for Plaintiff). Thus, Barnes' BATNAF undermined Plaintiff's claim of pretext.

Plaintiff, nevertheless, argued because other BATs, including Soebbing and Barnes, committed "more egregious" mistakes during the raids exercises than she did, then Defendant's decision not to dismiss these BATs from the DEA Training Academy is evidence of pretext. Dkt. 99 at 27. However, as already discussed, Plaintiff's personal and subjective assessment of other BATs' performance could not and does not create a genuine dispute of material fact that the DEA's decision to terminate Plaintiff for failing to meet Order 412's requirement was a pretext for discrimination. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir.

2005) ("[The employee] cannot establish her own criteria for judging her qualifications[,]" but instead must be judged "based on the qualifications established by her employer").

As to Plaintiff's second argument, Plaintiff asserted that her "inability to use the radio and [her] lack of communication" were a consequence of her injury "and not based on poor performance." Dkt. 99 at 27. However, in arguing as such, Plaintiff conceded that she made mistakes during Raids Exercise #8. In addition, the record showed that Plaintiff made mistakes before she was injured. Plaintiff's BATNAF stated that she "abandoned her position covering the primary suspect" and "expos[ed] the front of her body to [the] secondary suspect (and her back to the unsecured primary suspect)." DEX 20 at 45. Plaintiff also failed to communicate over her handheld radio during this time. *Id.* Further, SA Macri stated that after being injured, Plaintiff failed to use the "safe word," despite previously being instructed to do so. DEX 14 ¶ 13. Accordingly, Plaintiff's second argument offered little, if any, support of her claim of pretext.

In short, in considering whether Plaintiff could meet her burden of proving that Defendant's offered reason for terminating Plaintiff from the DEA Training Academy was pretext, this Court's only "concern [was] whether the reason for which the defendant [failed] the plaintiff was discriminatory." *Hawkins*, 203 F.3d at 280 (citation omitted). Here, Plaintiff presented no evidence suggesting that her termination was motivated by discrimination; and as such, Plaintiff failed to establish that the DEA's decision to terminate her was pretextual.

### Conclusion

The record before this Court demonstrated that there was no genuine dispute of material fact that Plaintiff, Saudhy M. Bliss, did not satisfactorily meet Defendant's legitimate expectations for the job and thus, she could not establish a *prima facie* case of discrimination. Furthermore, Defendant offered a legitimate and non-discriminatory reason for Plaintiff's termination, and

Plaintiff failed to present evidence that this reason was pretextual.  Accordingly, Defendant was entitled to summary judgment as a matter of law.

Entered this 30th day of  December, 2024
Alexandria, Virginia

Patricia Tolliver Giles
United States District Judge

24